# LINCOLN, ACTING DIRECTOR, INDIAN HEALTH SERVICE, ET AL. *v.* VIGIL ET AL.

No. 91–1833.   Argued March 3, 1993—Decided May 24, 1993

*Edwin S. Kneedler* argued the cause for petitioners. With him on the briefs were *Solicitor General Starr, Acting Assistant Attorney General O'Meara, James A. Feldman, Anne S. Almy, John A. Bryson,* and *Andrew C. Mergen.*

*Joel R. Jasperse* argued the cause and filed a brief for respondents.*

JUSTICE SOUTER delivered the opinion of the Court.

For several years in the late 1970's and early 1980's, the Indian Health Service provided diagnostic and treatment services, referred to collectively as the Indian Children's Program (Program), to handicapped Indian children in the Southwest. In 1985, the Service decided to reallocate the Program's resources to a nationwide effort to assist such children. We hold that the Service's decision to discontinue the Program was "committed to agency discretion by law" and therefore not subject to judicial review under the Administrative Procedure Act, 5 U. S. C. § 701(a)(2), and that the Service's exercise of that discretion was not subject to the notice-and-comment rulemaking requirements imposed by § 553.

---

*Briefs of *amici curiae* urging affirmance were filed for Bristol Bay Area Health Corp. et al. by *Charles A. Hobbs;* for the National Congress of American Indians et al. by *Steven C. Moore;* and for the Native American Protection & Advocacy Project et al. by *Thomas W. Christie.*

# I

The Indian Health Service, an agency within the Public Health Service of the Department of Health and Human Services, provides health care for some 1.5 million American Indian and Alaska Native people. Brief for Petitioners 2. The Service receives yearly lump-sum appropriations from Congress and expends the funds under authority of the Snyder Act, 42 Stat. 208, as amended, 25 U. S. C. § 13, and the Indian Health Care Improvement Act, 90 Stat. 1400, as amended, 25 U. S. C. § 1601 *et seq.* So far as it concerns us here, the Snyder Act authorizes the Service to "expend such moneys as Congress may from time to time appropriate, for the benefit, care, and assistance of the Indians," for the "relief of distress and conservation of health." 25 U. S. C. § 13.[1] The Improvement Act authorizes expenditures for, *inter alia,* Indian mental-health care, and specifically for "therapeutic and residential treatment centers." § 1621(a)(4)(D).

The Service employs roughly 12,000 people and operates more than 500 health-care facilities in the continental United States and Alaska. See Hearings on Department of the Interior and Related Agencies Appropriations for 1993 before a Subcommittee of the House Committee on Appropriations, 102d Cong., 2d Sess., pt. 4, p. 32 (1992); Brief for Petitioners 2. This case concerns a collection of related services, commonly known as the Indian Children's Program, that the Service provided from 1978 to 1985. In the words of the Court of Appeals, a "clou[d] [of] bureaucratic haze" obscures the history of the Program, *Vigil* v. *Rhoades,* 953 F. 2d 1225, 1226 (CA10 1992), which seems to have grown out of a plan "to establish therapeutic and residential treatment centers

---

[1] By its terms, the Snyder Act applies to the Bureau of Indian Affairs, an agency within the Department of the Interior. Under 42 U. S. C. § 2001(a), however, the Bureau's authorities and responsibilities with respect to "the conservation of the health of Indians" have been transferred to the Department of Health and Human Services.

for disturbed Indian children." H. R. Rep. No. 94–1026, pt. 1, p. 80 (1976) (prepared in conjunction with enactment of the Improvement Act). These centers were to be established under a "major cooperative care agreement" between the Service and the Bureau of Indian Affairs, *id.*, at 81, and would have provided such children "with intensive care in a residential setting." *Id.*, at 80.

Congress never expressly appropriated funds for these centers. In 1978, however, the Service allocated approximately $292,000 from its fiscal year 1978 appropriation to its office in Albuquerque, New Mexico, for the planning and development of a pilot project for handicapped Indian children, which became known as the Indian Children's Program. See 953 F. 2d, at 1227. The pilot project apparently convinced the Service that a building was needed, and, in 1979, the Service requested $3.5 million from Congress to construct a diagnostic and treatment center for handicapped Indian children. See *ibid.;* Hearings on Department of the Interior and Related Agencies Appropriations for 1980 before a Subcommittee of the House Committee on Appropriations, 96th Cong., 1st Sess., pt. 8, p. 250 (1979) (hereinafter House Hearings (Fiscal Year 1980)). The appropriation for fiscal year 1980 did not expressly provide the requested funds, however, and legislative reports indicated only that Congress had increased the Service's funding by $300,000 for nationwide expansion and development of the Program in coordination with the Bureau. See H. R. Rep. No. 96–374, pp. 82–83 (1979); S. Rep. No. 96–363, p. 91 (1979).

Plans for a national program to be managed jointly by the Service and the Bureau were never fulfilled, however, and the Program continued simply as an offering of the Service's Albuquerque office, from which the Program's staff of 11 to 16 employees would make monthly visits to Indian communities in New Mexico and southern Colorado and on the Navajo and Hopi Reservations. Brief for Petitioners 6. The Program's staff provided "diagnostic, evaluation, treatment

planning and followup services" for Indian children with emotional, educational, physical, or mental handicaps. "For parents, community groups, school personnel and health care personnel," the staff provided "training in child development, prevention of handicapping conditions, and care of the handicapped child." Hearings on Department of the Interior and Related Agencies Appropriations for 1984 before a Subcommittee of the House Committee on Appropriations, 98th Cong., 1st Sess., pt. 3, p. 374 (1983) (Service submission) (hereinafter House Hearings (Fiscal Year 1984)). Congress never authorized or appropriated moneys expressly for the Program, and the Service continued to pay for its regional activities out of annual lump-sum appropriations from 1980 to 1985, during which period the Service repeatedly apprised Congress of the Program's continuing operation. See, *e. g.,* Hearings on Department of the Interior and Related Agencies Appropriations for 1985 before a Subcommittee of the House Committee on Appropriations, 98th Cong., 2d Sess., pt. 3, p. 486 (1984) (Service submission); House Hearings (Fiscal Year 1984), pt. 3, pp. 351, 374 (same); Hearings on Department of the Interior and Related Agencies Appropriations for 1983 before a Subcommittee of the House Committee on Appropriations, 97th Cong., 2d Sess., pt. 3, p. 167 (1982) (same); Hearings on Department of the Interior and Related Agencies Appropriations for 1982 before a Subcommittee of the House Committee on Appropriations, 97th Cong., 1st Sess., pt. 9, p. 71 (1981) (testimony of Service Director); Hearings on Department of the Interior and Related Agencies Appropriations for 1981 before a Subcommittee of the House Committee on Appropriations, 96th Cong., 2d Sess., pt. 3, p. 632 (1980) (Service submission); House Hearings (Fiscal Year 1980), pt. 8, pp. 245–252 (testimony of Service officials); H. R. Rep. No. 97–942, p. 110 (1982) (House Appropriations Committee "is pleased to hear of the continued success of the Indian Children's Program").

Nevertheless, the Service had not abandoned the proposal for a nationwide treatment program, and in June 1985 it notified those who referred patients to the Program that it was "re-evaluating [the Program's] purpose . . . as a national mental health program for Indian children and adolescents." App. 77. In August 1985, the Service determined that Program staff hitherto assigned to provide direct clinical services should be reassigned as consultants to other nationwide Service programs, 953 F. 2d, at 1226, and discontinued the direct clinical services to Indian children in the Southwest. The Service announced its decision in a memorandum, dated August 21, 1985, addressed to Service offices and Program referral sources:

> "As you are probably aware, the Indian Children's Program has been involved in planning activities focusing on a national program effort. This process has included the termination of all direct clinical services to children in the Albuquerque, Navajo and Hopi reservation service areas. During the months of August and September, . . . staff will [see] children followed by the program in an effort to update programs, identify alternative resources and facilitate obtaining alternative services. In communities where there are no identified resources, meetings with community service providers will be scheduled to facilitate the networking between agencies to secure or advocate for appropriate services." App. 80.

The Service invited public "input" during this "difficult transition," and explained that the reallocation of resources had been "motivated by our goal of increased mental health services for all Indian [c]hildren." *Ibid.*[2]

---

[2] As of August 1985, the Program was providing services for 426 handicapped Indian children, and the Bureau continues to provide services for such children in discharging its responsibilities under the Education for All Handicapped Children Act of 1975, 89 Stat. 773, as amended, 20 U. S. C. § 1400 *et seq. Vigil* v. *Rhoades,* 953 F. 2d 1225, 1227 (CA10 1992).

Respondents, handicapped Indian children eligible to receive services through the Program, subsequently brought this action for declaratory and injunctive relief against petitioners, the Director of the Service and others (collectively, the Service), in the United States District Court for the District of New Mexico. Respondents alleged, *inter alia*, that the Service's decision to discontinue direct clinical services violated the federal trust responsibility to Indians, the Snyder Act, the Improvement Act, the Administrative Procedure Act, various agency regulations, and the Fifth Amendment's Due Process Clause.

The District Court granted summary judgment for respondents. *Vigil* v. *Rhoades,* 746 F. Supp. 1471 (1990). The District Court held that the Service's decision to discontinue the Program was subject to judicial review, rejecting the argument that the Service's decision was "committed to agency discretion by law" under the Administrative Procedure Act (APA), 5 U. S. C. § 701(a)(2). 746 F. Supp., at 1479. The court declined on ripeness grounds, however, to address the merits of the Service's action. It held that the Service's decision to discontinue the Program amounted to the making of a "legislative rule" subject to the APA's notice-and-comment requirements, 5 U. S. C. § 553, and that the termination was also subject to the APA's publication requirements for the adoption of "statements of general policy," § 552(a)(1)(D). See 746 F. Supp., at 1480, 1483. Because the Service had not met these procedural requirements, the court concluded that the termination was procedurally invalid and that judicial review would be "premature." *Id.,* at 1483. The court ordered the Service to reinstate the Program, *id.,* at 1486–1487, and the Solicitor General has represented that a reinstated Program is now in place. Brief for Petitioners 9.

The Court of Appeals affirmed. Like the District Court, it rejected the Service's argument that the decision to discontinue the Program was committed to agency discretion

under the APA. Although the court concededly could identify no statute or regulation even mentioning the Program, see 953 F. 2d, at 1229, it believed that the repeated references to it in the legislative history of the annual appropriations Acts, *supra*, at 187, "in combination with the special relationship between the Indian people and the federal government," 953 F. 2d, at 1230, provided a basis for judicial review. The Court of Appeals also affirmed the District Court's ruling that the Service was subject to the APA's notice-and-comment procedures in terminating the Program, reasoning that our decision in *Morton* v. *Ruiz,* 415 U. S. 199 (1974), requires as much whenever the Federal Government " 'cuts back congressionally created and funded programs for Indians.'" 953 F. 2d, at 1231 (citation omitted). The Court of Appeals did not consider whether the APA's publication requirements applied to the Service's decision to terminate the Program or whether the District Court's order to reinstate the Program was a proper form of relief, an issue the Service had failed to raise. *Id.,* at 1231–1232. We granted certiorari to address the narrow questions presented by the Court of Appeals's decision. 506 U. S. 813 (1992).

## II

First is the question whether it was error for the Court of Appeals to hold the substance of the Service's decision to terminate the Program reviewable under the APA. The APA provides that "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof," 5 U. S. C. § 702, and we have read the APA as embodying a "basic presumption of judicial review," *Abbott Laboratories* v. *Gardner,* 387 U. S. 136, 140 (1967). This is "just" a presumption, however, *Block* v. *Community Nutrition Institute,* 467 U. S. 340, 349 (1984), and under § 701(a)(2) agency action is not subject to judicial review "to the extent that" such action "is committed

to agency discretion by law."[3]  As we explained in *Heckler* v. *Chaney*, 470 U. S. 821, 830 (1985), § 701(a)(2) makes it clear that "review is not to be had" in those rare circumstances where the relevant statute "is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion."  See also *Webster* v. *Doe*, 486 U. S. 592, 599–600 (1988); *Citizens to Preserve Overton Park, Inc.* v. *Volpe*, 401 U. S. 402, 410 (1971).  "In such a case, the statute ('law') can be taken to have 'committed' the decisionmaking to the agency's judgment absolutely."  *Heckler, supra,* at 830.

Over the years, we have read § 701(a)(2) to preclude judicial review of certain categories of administrative decisions that courts traditionally have regarded as "committed to agency discretion."  See *Franklin* v. *Massachusetts*, 505 U. S. 788, 817 (1992) (STEVENS, J., concurring in part and concurring in judgment); *Webster, supra,* at 609 (SCALIA, J., dissenting).  In *Heckler* itself, we held an agency's decision not to institute enforcement proceedings to be presumptively unreviewable under § 701(a)(2).  470 U. S., at 831.  An agency's "decision not to enforce often involves a complicated balancing of a number of factors which are peculiarly within its expertise," *ibid.*, and for this and other good reasons, we concluded, "such a decision has traditionally been 'committed to agency discretion,'" *id.*, at 832.  Similarly, in *ICC* v. *Locomotive Engineers*, 482 U. S. 270, 282 (1987), we held that § 701(a)(2) precludes judicial review of another type of administrative decision traditionally left to agency discretion, an agency's refusal to grant reconsideration of an action because of material error.  In so holding, we emphasized "the impossibility of devising an adequate standard of review for such

---

[3] In full, § 701(a) provides: "This chapter [relating to judicial review] applies, according to the provisions thereof, except to the extent that— (1) statutes preclude judicial review; or (2) agency action is committed to agency discretion by law."  The parties have not addressed, and we have no occasion to consider, the application of § 701(a)(1) in this case.

agency action." *Ibid.* Finally, in *Webster, supra,* at 599–601, we held that § 701(a)(2) precludes judicial review of a decision by the Director of Central Intelligence to terminate an employee in the interests of national security, an area of executive action "in which courts have long been hesitant to intrude." *Franklin, supra,* at 819 (STEVENS, J., concurring in part and concurring in judgment).

The allocation of funds from a lump-sum appropriation is another administrative decision traditionally regarded as committed to agency discretion. After all, the very point of a lump-sum appropriation is to give an agency the capacity to adapt to changing circumstances and meet its statutory responsibilities in what it sees as the most effective or desirable way. See *International Union, United Automobile, Aerospace & Agricultural Implement Workers of America v. Donovan,* 241 U. S. App. D. C. 122, 128, 746 F. 2d 855, 861 (1984) (Scalia, J.) ("A lump-sum appropriation leaves it to the recipient agency (as a matter of law, at least) to distribute the funds among some or all of the permissible objects as it sees fit") (footnote omitted), cert. denied *sub nom. Automobile Workers v. Brock,* 474 U. S. 825 (1985); 2 United States General Accounting Office, Principles of Federal Appropriations Law, p. 6–159 (2d ed. 1992). For this reason, a fundamental principle of appropriations law is that where "Congress merely appropriates lump-sum amounts without statutorily restricting what can be done with those funds, a clear inference arises that it does not intend to impose legally binding restrictions, and indicia in committee reports and other legislative history as to how the funds should or are expected to be spent do not establish any legal requirements on" the agency. *LTV Aerospace Corp.,* 55 Comp. Gen. 307, 319 (1975); cf. *American Hospital Assn. v. NLRB,* 499 U. S. 606, 616 (1991) (statements in committee reports do not have the force of law); *TVA v. Hill,* 437 U. S. 153, 191 (1978) ("Expressions of committees dealing with requests for ap-

propriations cannot be equated with statutes enacted by Congress"). Put another way, a lump-sum appropriation reflects a congressional recognition that an agency must be allowed "flexibility to shift . . . funds within a particular . . . appropriation account so that" the agency "can make necessary adjustments for 'unforeseen developments'" and "'changing requirements.'" *LTV Aerospace Corp., supra,* at 318 (citation omitted).

Like the decision against instituting enforcement proceedings, then, an agency's allocation of funds from a lump-sum appropriation requires "a complicated balancing of a number of factors which are peculiarly within its expertise": whether its "resources are best spent" on one program or another; whether it "is likely to succeed" in fulfilling its statutory mandate; whether a particular program "best fits the agency's overall policies"; and, "indeed, whether the agency has enough resources" to fund a program "at all." *Heckler,* 470 U. S., at 831. As in *Heckler,* so here, the "agency is far better equipped than the courts to deal with the many variables involved in the proper ordering of its priorities." *Id.,* at 831–832. Of course, an agency is not free simply to disregard statutory responsibilities: Congress may always circumscribe agency discretion to allocate resources by putting restrictions in the operative statutes (though not, as we have seen, just in the legislative history). See *id.,* at 833. And, of course, we hardly need to note that an agency's decision to ignore congressional expectations may expose it to grave political consequences. But as long as the agency allocates funds from a lump-sum appropriation to meet permissible statutory objectives, § 701(a)(2) gives the courts no leave to intrude. "[T]o [that] extent," the decision to allocate funds "is committed to agency discretion by law." § 701(a)(2).

The Service's decision to discontinue the Program is accordingly unreviewable under § 701(a)(2). As the Court of Appeals recognized, the appropriations Acts for the relevant

period do not so much as mention the Program,[4] and both the Snyder Act and the Improvement Act likewise speak about Indian health only in general terms. It is true that the Service repeatedly apprised Congress of the Program's continued operation, but, as we have explained, these representations do not translate through the medium of legislative history into legally binding obligations. The reallocation of agency resources to assist handicapped Indian children nationwide clearly falls within the Service's statutory mandate to provide health care to Indian people, see *supra*, at 185, and respondents, indeed, do not seriously contend otherwise. The decision to terminate the Program was committed to the Service's discretion.

The Court of Appeals saw a separate limitation on the Service's discretion in the special trust relationship existing between Indian people and the Federal Government. 953 F. 2d, at 1230–1231. We have often spoken of this relationship, see, *e. g., Cherokee Nation* v. *Georgia,* 5 Pet. 1, 17 (1831) (Marshall, C. J.) (Indians' "relation to the United States resembles that of a ward to his guardian"), and the law is "well established that the Government in its dealings with Indian tribal property acts in a fiduciary capacity," *United States* v. *Cherokee Nation of Okla.,* 480 U. S. 700, 707 (1987); see also

---

[4] Significantly, Congress did see fit on occasion to impose other statutory restrictions on the Service's allocation of funds from its lump-sum appropriations. For example, the appropriations Act for fiscal year 1985 provided that "none of the funds appropriated under this Act to [the Service] shall be available for the initial lease of permanent structures without advance provision therefor in appropriations Acts." Pub. L. 98–473, 98 Stat. 1864. Similarly, the appropriations Act for fiscal year 1983 provided that "notwithstanding current regulations, eligibility for Indian Health Services shall be extended to non-Indians in only two situations: (1) a non-Indian woman pregnant with an eligible Indian's child for the duration of her pregnancy through postpartum, and (2) non-Indian members of an eligible Indian's household if the medical officer in charge determines that this is necessary to control acute infectious disease or a public health hazard." Pub. L. 97–394, 96 Stat. 1990.

*Quick Bear* v. *Leupp*, 210 U. S. 50, 80 (1908) (distinguishing between money appropriated to fulfill treaty obligations, to which trust relationship attaches, and "gratuitous appropriations"). Whatever the contours of that relationship, though, it could not limit the Service's discretion to reorder its priorities from serving a subgroup of beneficiaries to serving the broader class of all Indians nationwide. See *Hoopa Valley Tribe* v. *Christie*, 812 F. 2d 1097, 1102 (CA9 1986) (Federal Government "does have a fiduciary obligation to the Indians; but it is a fiduciary obligation that is owed to *all* Indian tribes") (emphasis added).

One final note: although respondents claimed in the District Court that the Service's termination of the Program violated their rights under the Fifth Amendment's Due Process Clause, see *supra*, at 189, that court expressly declined to address respondents' constitutional arguments, 746 F. Supp., at 1483, as did the Court of Appeals, 953 F. 2d, at 1228–1229, n. 3. Thus, while the APA contemplates, in the absence of a clear expression of contrary congressional intent, that judicial review will be available for colorable constitutional claims, see *Webster*, 486 U. S., at 603–604, the record at this stage does not allow mature consideration of constitutional issues, which we leave for the Court of Appeals on remand.

### III

We next consider the Court of Appeals's holding, quite apart from the matter of substantive reviewability, that before terminating the Program the Service was required to abide by the familiar notice-and-comment rulemaking provisions of the APA, 5 U. S. C. § 553. Section 553 provides generally that an agency must publish notice of a proposed rulemaking in the Federal Register and afford "interested persons an opportunity to participate . . . through submission of written data, views, or arguments." §§ 553(b), (c). The same section also generally requires the agency to publish a rule not less than 30 days before its effective date and

incorporate within it "a concise general statement" of the rule's "basis and purpose." §§ 553(c), (d). There are exceptions, of course. Section 553 has no application, for example, to "a matter relating to agency management or personnel or to public property, loans, grants, benefits, or contracts." § 553(a)(2).[5] The notice-and-comment requirements apply, moreover, only to so-called "legislative" or "substantive" rules; they do not apply to "interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice." § 553(b). See *McLouth Steel Products Corp.* v. *Thomas*, 267 U. S. App. D. C. 367, 370, 838 F. 2d 1317, 1320 (1988); *Community Nutrition Institute* v. *Young*, 260 U. S. App. D. C. 294, 296–297, 818 F. 2d 943, 945–946 (1987) *(per curiam); id.*, at 301–303, 818 F. 2d, at 950–952 (Starr, J., concurring in part and dissenting in part); Anthony, Interpretive Rules, Policy Statements, Guidances, Manuals, and the Like—Should Federal Agencies Use Them to Bind the Public?, 41 Duke L. J. 1311, 1321 (1992); see generally *Chrysler Corp.* v. *Brown*, 441 U. S. 281, 301 (1979) (noting that this is "[t]he central distinction among agency regulations found in the APA").

It is undisputed that the Service did not abide by these notice-and-comment requirements before discontinuing the Program and reallocating its resources. The Service argues that it was free from any such obligation because its decision to terminate the Program did not qualify as a "rule" within the meaning of the APA. Brief for Petitioners 29–34. Respondents, to the contrary, contend that the Service's action falls well within the APA's broad definition of that term. § 551(4).[6] Brief for Respondents 17–19. Determin-

---

[5] In "'matter[s] relating to . . . benefits,'" the Secretary of Health and Human Services has determined, as a matter of policy, to abide by the APA's notice-and-comment requirements. Brief for Petitioners 33, n. 19.

[6] Section 551(4) provides that "'rule' means the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or describing

ing whether an agency's statement is what the APA calls a "rule" can be a difficult exercise. We need not conduct that exercise in this case, however. For even assuming that a statement terminating the Program would qualify as a "rule" within the meaning of the APA, it would be exempt from the notice-and-comment requirements of § 553.[7] Termination of the Program might be seen as affecting the Service's organization, but "rules of agency organization" are exempt from notice-and-comment requirements under § 553(b)(A). Moreover, § 553(b)(A) also exempts "general statements of policy," which we have previously described as " 'statements issued by an agency to advise the public prospectively of the manner in which the agency proposes to exercise a discretionary power.' " *Chrysler Corp.*, *supra*, at 302, n. 31 (quoting Attorney General's Manual on the Administrative Procedure Act 30, n. 3 (1947)). Whatever else may be considered a "general statemen[t] of policy," the term surely includes an announcement like the one before us, that an agency will discontinue a discretionary allocation of unrestricted funds from a lump-sum appropriation.

Our decision in *Citizens to Preserve Overton Park, Inc.* v. *Volpe*, 401 U. S. 402 (1971), confirms our conclusion that the Service was not required to follow the notice-and-comment procedures of § 553 before terminating the Program. *Overton Park* dealt with the Secretary of Transportation's decision to authorize the use of federal funds to construct an interstate highway through a public park in Memphis, Tennessee. Private citizens and conservation organizations

---

the organization, procedure, or practice requirements of an agency and includes the approval or prescription for the future of rates, wages, corporate or financial structures or reorganizations thereof, prices, facilities, appliances, services or allowances therefor or of valuations, costs, or accounting, or practices bearing on any of the foregoing."

[7] We express no view on the application of the publication requirements of § 552, or on the propriety of the relief granted by the District Court. The Court of Appeals did not address these issues. See *supra*, at 190.

claimed that the Secretary's decision violated federal statutes prohibiting the use of federal funds for such a purpose where there existed a "'feasible and prudent'" alternative route, *id.*, at 405 (citations omitted), and argued, *inter alia*, that the Secretary's determination was subject to judicial review under the APA's "substantial evidence" standard, 5 U. S. C. § 706(2)(E). 401 U. S., at 414. In rejecting that contention, we explained that the substantial-evidence test applies, in addition to circumstances not relevant here, only where "agency action is taken pursuant to [the] rulemaking provision[s]" of § 553. We held unequivocally that "[t]he Secretary's decision to allow the expenditure of federal funds to build [the highway] through [the park] was plainly not an exercise of a rulemaking function." *Ibid.*

*Overton Park* is authority here for the proposition that decisions to expend otherwise unrestricted funds are not, without more, subject to the notice-and-comment requirements of § 553. Although the Secretary's determination in *Overton Park* was subject to statutory criteria of "'feasib[ility] and pruden[ce],'" *id.*, at 405, the generality of those standards underscores the administrative discretion inherent in the determination (reviewable though it was), to which the Service's discretionary authority to meet its obligations under the Snyder and Improvement Acts is comparable. Indeed, respondents seek to distinguish *Overton Park* principally on the ground that the Service's determination altered the eligibility criteria for Service assistance. See Brief for Respondents 24–25. But the record fails to support the distinction, there being no indication that the Service's decision to discontinue the Program (or, for that matter, to initiate it) did anything to modify eligibility standards for Service care, as distinct from affecting the availability of services in a particular geographic area. The Service's decision to reallocate funds presumably did mean that respondents would no longer receive certain services, but it did not alter the Service's criteria for providing assistance any more than the

Service's initiation of the pilot project in 1978 altered the criteria for assistance to Indians in South Dakota.

Nor, finally, do we think that the Court of Appeals was on solid ground in holding that *Morton* v. *Ruiz*, 415 U. S. 199 (1974), required the Service to abide by the APA's notice-and-comment provisions before terminating the Program. Those provisions were not at issue in *Ruiz*, where respondents challenged a provision, contained in a Bureau of Indian Affairs manual, that restricted eligibility for Indian assistance. Although the Bureau's own regulations required it to publish the provision in the Federal Register, the Bureau had failed to do so. *Id.*, at 233–234. We held that the Bureau's failure to abide by its own procedures rendered the provision invalid, stating that, under those circumstances, the denial of benefits would be "inconsistent with 'the distinctive obligation of trust incumbent upon the Government in its dealings with these dependent and sometimes exploited people.'" *Id.*, at 236 (quoting *Seminole Nation* v. *United States*, 316 U. S. 286, 296 (1942)). No such circumstances exist here.

## IV

The judgment of the Court of Appeals is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*